IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                             Crim. No. 19-1717 KG

STEVEN MAYNES,

       Defendant.

AMENDED MEMORANDUM OPINION AND ORDER[1]

This matter comes before the Court upon Defendant's Motion to Suppress, filed August 13, 2019. (Doc. 26). Defendant seeks to suppress all evidence obtained as a result of the search of his residence and truck on November 2, 2016. *Id.* at 1. The United States filed its response on September 10, 2019, (Doc. 30), and the Court held an evidentiary hearing on October 17, 2019, (Doc. 50) (Clerk's Minutes). On October 25, 2019, Defendant filed a supplemental brief, and on October 31, 2019, the United States filed a response to the supplemental brief. (Docs. 51 and 52). Having considered the Motion to Suppress, the accompanying briefing, the evidence, and the argument of counsel at the evidentiary hearing, the Court denies the Motion to Suppress.

    I.     *Findings of Fact*

On November 2, 2016, Children, Youth and Families Department (CYFD) case worker Ashley Crotts contacted Lieutenant Detective Matthew Rudiger regarding possible child abuse or neglect of Defendant's three children. Transcript of October 17, 2019, evidentiary hearing (Tr.)

---

[1] The Court's Memorandum Opinion and Order, (Doc. 53), issued November 5, 2019, is hereby amended to omit references to the incorrect standard of review as set forth in the Court's Order granting the United States' Motion to Reconsider. (Doc. 65).

at 8.[2]  After arriving at CYFD offices, Lieutenant Rudiger spoke to Ms. Crotts and reviewed her handwritten notes.  Tr. at 8, 171.  Her notes indicated that the day before, Defendant's four-year-old son, who is non-verbal and has Down syndrome, had what looked like an open burn on his inner thigh.  (Doc. 26-1) at 4.  The school nurse questioned Defendant about the boy's injury, and Defendant said the boy had fallen off a rocking horse, but the nurse did not think the injury was consistent with a fall.[3]  (Doc. 26-1) at 4.  Ms. Crotts was further informed that the child is behind on immunizations, attends school with dirty clothes, is often tardy or absent, and is very aggressive when he returns to school.  *Id.*

Ms. Crotts' notes state that she interviewed Defendant's six-year-old daughter, who said that her dad has guns in the house and sometimes does not put them away, and that she knows to aim the guns down when she hands them to someone.  *Id.* at 5.  She further stated her dad smokes weed and puts a lot of weed in the attic, and she is not sure if he does other drugs.  *Id.*  She said she sometimes has to wake her mom up to make food, her mom does drugs with her dad, she cracked her head at the family's new house, and she is not supposed to talk about what happens at home.  *Id.*  Ms. Crotts also interviewed Defendant's eight-year-old son, who stated he has to wake his mom up to get food, he is not supposed to say what happens at home, and he had fallen and hurt his leg the night before.  *Id.*  Additionally, he stated his dad has guns, his mom and dad go to the attic and tell the children to lock the doors, and he denied knowing of any drug use.  *Id.*

---

[2] The Court's citation to the hearing transcript refers to the court reporter's original unedited version.  Any final transcript may contain slightly different page numbers.

[3] At the evidentiary hearing, Defendant's counsel elicited testimony that the "school nurse" was actually a "CNA," or "certified nursing assistant."  Tr. at 51-52.

After discussing the information with Ms. Crotts and reviewing her notes, Lieutenant Rudiger signed a statement of reasonable grounds which resulted in the children being placed in CYFD custody until the investigation was completed or safer conditions were obtained. Tr. at 22, 171; (Doc. 26-1) at 5. The children were transported to the CYFD office where Lieutenant Rudiger took pictures of them to document their injuries. Tr. at 10; (Doc. 26-1) at 5. Lieutenant Rudiger ran a background check on Defendant and the children's mother, Ashley Means, and found that Ms. Means had a warrant for her arrest and Defendant had a history of felony arrests and one felony conviction. Tr. at 22-24.

Lieutenant Rudiger then prepared an application for a search warrant to investigate the crimes of child abuse and narcotics. Tr. at 24, 45. He asked Ms. Crotts to type up her handwritten notes and email them to him, and he cut and pasted the emailed notes into his affidavit. Tr. at 88-91, 171. Lieutenant Rudiger learned from Ms. Crotts that the family had recently moved to Deming and he received the family's current address from CYFD. Tr. at 47, 107. He showed the search warrant application to Chief Deputy District Attorney Janice Schryer for review, and then presented it to Luna County Magistrate Judge Ray Baese who reviewed and signed the search warrant allowing officers to search 415 E. Hemlock Street, Deming, New Mexico, and its curtilage, for firearms and accessories, ammunition, illegal narcotics, and illegal narcotics paraphernalia. Tr. at 24-25; (Doc. 26-1) at 1-6.

That afternoon, Defendant and Ms. Means were told their children were taken from school and placed with CYFD, and they were instructed to meet Ms. Crotts at their residence. (Doc. 26) at 3. At approximately 3:30 p.m., Defendant and Ms. Means arrived at 415 East Hemlock Street in Defendant's truck. *Id.* Lieutenant Rudiger testified that when he arrived at the residence, Defendant and Ms. Means were already there, as well as Detective James Fetrow,

Detective Lara, and Officer Butler. Tr. at 25. Detective Fetrow testified that he, Detective Lara, and Officer Butler were armed, and that Officer Butler was in uniform. Tr. at 130. Defendant and Ms. Means were separated and asked not to stand next to each other. Tr. at 36, 83. Contradictory testimony was presented on whether Defendant was placed in handcuffs. *Compare* Tr. at 26, 34, 42, 87, 122-23, 126 (Lieutenant Rudiger and Detective Fetrow's testimony that Defendant was not in handcuffs), *with* Tr. at 148-49, 152, 164 (the testimony of Defendant's neighbor, Luis Samaniego, that he saw Defendant in handcuffs). Both Lieutenant Rudiger and Detective Fetrow denied taking Defendant's identification from him at any time. Tr. at 86-87, 129.

Upon approaching Defendant, Lieutenant Rudiger attested that he told Defendant he had a search warrant for the house based on allegations of narcotics and weapons and to investigate possible child abuse or neglect. Tr. at 29. Lieutenant Rudiger stated that he asked Defendant if there were any weapons present for officer safety purposes, and Defendant told him there were weapons inside his truck and he would provide them to the detectives. Tr. at 31. Lieutenant Rudiger understood this to be verbal consent to retrieve the weapons from Defendant's truck, and he instructed Detective Fetrow to do so. Tr. at 31-33. Detective Fetrow searched the truck and Lieutenant Rudiger and Detective Lara executed the search warrant on the residence. Tr. at 34. From the truck, Detective Fetrow seized two .22 caliber long rifles, three magazines, three boxes of ammunition, three glass pipes, a .22 caliber handgun, and a .357 revolver. (Doc. 26) at 4; (Doc. 26-1) at 8; Tr. at 125, 134. From the house, Lieutenant Rudiger and Detective Lara seized several bullets, a glass pipe, unknown pills, a small caliber handgun, and a box of ammunition. (Doc. 26) at 4; (Doc. 26-1) at 8.

After the search, Ms. Means was taken into custody pursuant to a warrant for her arrest and was transported to the police station for questioning. Tr. at 35-36. At the police station, and after being read her *Miranda* rights, Ms. Means stated there were guns and drugs in the home and that she and Defendant sold drugs. Tr. at 40. Defendant was not taken into custody on November 2, 2016. Instead, Lieutenant Rudiger told Defendant to come to his office at 8:30 a.m. the next day. Tr. at 41. Defendant arrived at Lieutenant Rudiger's office on November 3, 2016, shortly after 9:00 a.m., was advised of his *Miranda* rights, and told Lieutenant Rudiger there were guns and drugs in the house, that he sold drugs, and that he was a convicted felon. *Id.* On June 19, 2019, Defendant was charged with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). (Doc. 3) (Indictment).

The following witnesses testified at the October 17, 2019, suppression hearing: Lieutenant Rudiger, Detective Fetrow, and Mr. Samaniego. In addition, the Court admitted the following exhibits: Exhibits 1, 2, and 3 (photos of the residence and Defendant taken on November 2, 2016); and Exhibits 4, 5, 6, 7, 8 (photos of the children taken on November 2, 2016).

## II.     *Standard of Review*

"The proponent of a motion to suppress bears the burden of proof." *United States v. Clarkson*, 551 F.3d 1196, 1200 (10th Cir. 2009). However, the burden shifts to the United States to show, by a preponderance of the evidence, that the defendant's Fourth Amendment rights were not violated. *United States v. Matlock*, 415 U.S. 164, 177 (1974) (concluding the United States "sustained its burden of proving by the preponderance of the evidence that" search did not violate Fourth Amendment).

"Judging the credibility of the witnesses, determining the weight to be given to evidence, and drawing reasonable inferences and conclusions from the evidence are within the province of the district court." *United States v. Hunnicutt,* 135 F.3d 1345, 1348 (10th Cir. 1998). Factors beyond a witness's demeanor and tone of voice may weigh in a judge's decision to find that witness's testimony credible, including "[d]ocuments or objective evidence [that] may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985).

III.    *Discussion*

A.  *Search of Residence*

To comply with the Fourth Amendment, a search warrant must meet the following three conditions:

> First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense. Finally, warrants must particularly describe the things to be seized, as well as the place to be searched.

*Mink v. Knox*, 613 F.3d 995, 1003 (10th Cir. 2010) (quoting *Dalia v. United States*, 441 U.S. 238, 255 (1979)). "Although the reviewing court should afford a magistrate's probable cause decision great deference, it should not defer if there is no substantial basis for concluding that probable cause existed." *United States v. Beck*, 139 Fed. Appx. 950, 954 (10th Cir. 2005) (citation omitted). "Probable cause exists if facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Mink*, 613 F.3d at 1003 (citation omitted).

In ruling on a motion to suppress evidence obtained pursuant to a search warrant, "where the police do not present oral testimony to the reviewing magistrate, the … court must ascertain the existence of probable cause to support a warrant exclusively from the [search warrant] affidavit's four corners." *Beck*, 139 Fed. Appx. at 954. Moreover, a search warrant must "ensure[] that a search is confined in scope to particularly described evidence *relating to a specific crime* for which there is demonstrated probable cause." *Mink*, 613 F.3d at 1010 (citation omitted). "A warrant is overly broad if it does not contain sufficiently particularized language that creates a nexus between the suspected crime and the items to be seized." *Id.* (citation omitted).

### 1. The Search Warrant

Defendant first argues the search warrant is not supported by probable cause because the affidavit "relies solely on alleged information from a 6-year-old girl and an 8-year-old boy who were answering leading questions with absolutely no independent corroboration of the information," and because the information obtained from the children was conflicting. (Doc. 26) at 5. Defendant further argues the affiant did not establish that the injury to the four-year-old was intentional or the result of abuse or neglect. *Id.* at 5-6.

Contrary to Defendant's assertion, the affidavit for the search warrant is based on more than just the children's statements. For example, it includes information from school personnel that the four-year-old is behind on immunizations, attends school with dirty clothes, is often tardy or absent, and is very aggressive when he returns to school, and it refers to photos documenting the children's injuries. (Doc. 26-1) at 4-5. In addition, many of the statements by the six-year-old and eight-year-old are consistent, such as regarding the presence of and access to guns in the home, having to wake their mom up for dinner, the parents going to the attic, and that

they are not supposed to talk about what happens at home. *Id.* at 5. Therefore, the Court finds no error in the affiant's reliance on the children's statements. The Court also finds the affiant was not required to establish that the four-year-old's injury was the result of child abuse or neglect, just that there were "facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000) (citation omitted) (explaining probable cause requires "more than mere suspicion but less evidence than is necessary to convict").

Defendant next argues there was not sufficient probable cause to search the house because the warrant did not establish when or in which house the children had seen the guns and drugs, and it did not identify exactly where the guns were kept. (Doc. 26) at 5-6. The search warrant allowed law enforcement officers to search 415 East Hemlock Street and its curtilage for firearms, ammunition, and illegal narcotics and paraphernalia. (Doc. 26-1) at 3. However, Lieutenant Rudiger was aware that Defendant had moved to Deming, New Mexico, the week before and the children's statements about the guns and drugs did not refer to their new house. *See* Tr. at 47, 107; (Doc. 26-1) at 5. Nevertheless, the Tenth Circuit has explained that "an affiant officer need not draw an explicit connection between a suspect's activities and his residence for a Fourth Amendment nexus to exist." *United States v. Biglow*, 562 F.3d 1272, 1280 (10th Cir. 2009). Instead, magistrate judges may make inferences and "draw their own reasonable conclusions, based on the Government's affidavit and the practical considerations of everyday life as to the likelihood that certain evidence will be found at a particular place." *Id.* (citation omitted).

Here, the affidavit contains information linking several of the children's statements to their current residence. For example, the six-year-old told Ms. Crotts she "cracked her head at

the new house" and the four-year-old gets in trouble "a lot" for getting the guns, and the eight-year-old said that he hurt his leg "last night." (Doc. 26-1) at 5. In addition, the children refer to what happens at home—such as who lives in the house, how they are fed, what rooms their parents use, and their neighbors. *See id.* ("Lives with mom, dad and brothers," "Mom makes dinner but sometimes have to wake her up to make food," "Doesn't like that mom and dad go [to] the room and they lock the door behind them," "[Dad] gets a lot of weed, wraps in a paper and puts in the attic," "Doesn't feel safe at home," "Not supposed to talk about what happens at home"). Therefore, applying a common sense interpretation of the affidavit and showing deference to the magistrate judge's finding of probable cause, the Court finds a substantial basis for a probable cause finding that the items sought in the search warrant would be at the family's current address. *See Biglow*, 562 F.3d at 1282-83 (finding sufficient nexus between defendant's suspected drug trafficking and his residence based on "common sense" observation that "drug dealers often keep evidence related to their illegal activities at their homes").

Finally, Defendant states there was no information in the affidavit establishing that Defendant was a felon who was prohibited from possessing firearms. (Doc. 26) at 2, 6-7. This raises the Fourth Amendment's requirement that an officer seeking a warrant must show the "evidence sought will aid in a particular apprehension or conviction for a particular offense." *Mink*, 613 F.3d at 1003. In this case, the search warrant does not state which crime is being investigated and it is not clear whether the search warrant relates to the crimes of child abuse or neglect, illegal narcotics, or unlawful possession of a weapon. To illustrate, the affidavit states:

> After listening to the conflicting reports from the children and the lack of supervision and seeing that more investigation is needed to into [sic] the injuries and the weapons and narcotics in the house. I felt the house is unsafe for the children, therefore, I signed a protective statement of reasonable grounds, placing the children

into CYFD custody until the investigation is done or safer conditions are sought for the children. …

During this investigation I learned that Steven Maynes has been arrested for serious allegations such as aggravated assault and battery and in 2011 Steven was found or pled guilty to a domestic charge.

(Doc. 26-1) at 5.

In response to the Motion to Suppress, the United States argues the affidavit "provided probable cause to believe Defendant's children were being placed in situations that endanger their life or health," and cites to NMSA 1978, § 30-6-1(D) (Cum. Supp. 2015): "Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be: (1) placed in a situation that may endanger the child's life or health ... ." (Doc. 30) at 10, n.5. Nevertheless, "where the police do not present oral testimony to the reviewing magistrate, the … court must ascertain the existence of probable cause to support a warrant exclusively from the [search warrant] affidavit's four corners." *Beck*, 139 Fed. Appx. at 954. Because the warrant does not refer to a particular crime, it violates the Fourth Amendment's particularity requirement. *See Mink*, 613 F.3d at 1011 (finding search warrant "clearly invalid under the particularity clause of the Fourth Amendment" because it did not refer to particular crime).

Based on the foregoing, the Court finds the search warrant lacks sufficient particularity because it does not state what crime was being investigated. Therefore, the search warrant violates the Fourth Amendment.

### 2. *Good Faith Exception*

Under the good faith exception to the exclusionary rule, if "police officers act in reasonable reliance on a search warrant, issued by a detached and neutral magistrate but

ultimately found to be defective, the evidence so obtained should not be excluded." *United States v. Scales*, 903 F.2d 765, 767 (10th Cir. 1990). This doctrine protects "the exclusionary rule's purpose of deterring improper police action, rather than punishing errors made by the magistrates." *United States v. Gonzales*, 399 F.3d 1225, 1229 (10th Cir. 2005) (citing *United States v. Leon*, 468 U.S. 897, 916 (1984)). Because searches approved by a warrant "are favored," a "magistrate's determination that probable cause exists is entitled to great deference." *Id.* at 1228-29. Similarly, because "officers are generally not required to second-guess the magistrate's decision in granting a warrant, … evidence obtained pursuant to a warrant that is later found to be defective is not properly excluded when the warrant is relied on by the officers in objective good faith." *Id.* In applying the good faith exception, the court should "consider all of the circumstances, not only the text of the warrant, and … assume that the executing officers have a reasonable knowledge of what the law prohibits." *United States v. Otero*, 563 F.3d 1127, 1134 (10th Cir. 2009) (citing *United States v. Riccardi*, 405 F.3d 852, 863 (10th Cir. 2005)).

While reliance on a warrant issued by a neutral magistrate "creates a presumption the officer is acting in good faith," this "presumption is not absolute" and "[a]n officer's reliance on the defective warrant still must be objectively reasonable." *United States v. Chambers*, 882 F.3d 1305, 1310-11 (10th Cir. 2018), *cert. denied,* 138 S. Ct. 2695 (2018) (citations omitted). Indeed, the Supreme Court has identified four situations where courts should not rely on the good faith doctrine: (1) where the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit; (2) where the magistrate abandoned his judicial role and failed to perform his neutral and detached function; (3) where the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) where the warrant was "so facially deficient that it failed to particularize the place to be

searched or the things to be seized." *Leon*, 468 U.S. at 923; *United States v. Workman*, 863 F.3d 1313, 1317-18 (10th Cir. 2017).

### a. Abandonment of Judicial Role and Warrant Facially Deficient

In the Motion to Suppress, Defendant argues the good faith exception does not apply because the issuing judge wholly abandoned his judicial role and the warrant was facially deficient. (Doc. 26) at 8. Defendant does not provide any support for these arguments and they were not developed at the hearing. The Court finds no support in the record for a finding that the magistrate judge was not neutral or that he abandoned his judicial role. In addition, the search warrant was not facially deficient because it particularized the place to be searched and the items to be seized. *See* (Doc. 26-1) at 3. Therefore, the Court finds the second and fourth situations where an officer's reliance on a defective warrant is unreasonable do not apply.

### b. Warrant Lacking in Probable Cause

Defendant also contends the good faith exception does not apply because the supporting affidavit lacked probable cause. (Doc. 26) at 8-9. Specifically, Defendant argues the children's statements were not reliable and the affiant did not attempt to corroborate their allegations, the affidavit did not set forth why Defendant's possession of firearms would be evidence of a crime, and the affidavit did not include a timeframe or specific location for the guns and drugs. *Id.*

With regard to probable cause under the good faith exception, the Tenth Circuit explains that in considering "whether the officer relied in good faith upon a warrant, we must look to the underlying documents to see whether they are *devoid* of factual support, not merely whether the facts they contain are legally sufficient." *Chambers*, 882 F.3d at 1310-11. An affidavit devoid of factual support is "one that merely states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge."

*Id.*  Moreover, an affidavit "does not have to be a model of specificity" and it "has enough factual support to justify reliance if it establishes a *minimally sufficient nexus* between the illegal activity and the place to be searched."  *Id.*; *see also United States v. Gonzales*, 399 F.3d 1225, 1231 (10th Cir. 2005) (explaining good faith requires "minimal nexus" between property and suspected criminal activity).

   In the affidavit, Lieutenant Rudiger states CYFD contacted him for an investigation into "a possible child abuse and or neglect case," and he includes information about observed injuries to the children, the children's access to guns, and indications of drug use in the house.  (Doc. 26-1) at 4-5.  At the hearing, Lieutenant Rudiger and Detective Fetrow testified they were investigating the crimes of narcotics and child abuse or neglect, and Lieutenant Rudiger testified the statement that the four-year-old gets in trouble "a lot" for getting the guns indicated that it happens "often or daily."  Tr. at 24, 45, 104, 128-29.  In addition, the photographs of the children showed injuries that were not yet healed, and the children stated their injuries happened "at the new house" or "last night."  (Doc. 26-1) at 5.  Therefore, even though the warrant failed to state with particularity which crime was being investigated, it was objectively reasonable for the officers to rely on the warrant to search for evidence relating to the crimes of illegal narcotics and child abuse or neglect.  The affidavit does not merely contain suspicions, beliefs, or conclusions, and it provides at least a minimal nexus between the items to be seized and the address where Defendant and his family were living on November 2, 2016.  Accordingly, the Court finds the warrant was not based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  *Leon*, 468 U.S. at 923.

*c. Warrant Issued in Reliance on False Affidavit*

At the hearing, Defendant raised the argument that the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit by asserting that Lieutenant Rudiger "cherry picked" from Ms. Crotts' notes and did not include exculpatory statements made by the children. Tr. at 49, 69-73. The Court granted Defendant's request for additional time to present evidence in support of this argument, and, on October 25, 2019, Defendant filed a supplemental brief. (Doc. 51). Defendant's counsel stated that after the evidentiary hearing she spoke with Ms. Crotts by phone, and Ms. Crotts explained she no longer works for CYFD and spoke generally about her work there. *Id.* at 2-3. Ms. Crotts stated she worked on many abuse and neglect cases with Lieutenant Rudiger and they would communicate about those cases both verbally and via email. *Id.* She further stated that when interviewing children she would take handwritten notes and afterward would either type them out herself or read them into a dictation service that would transcribe them. *Id.* at 3. She would then usually shred her handwritten notes, but any notes that were not shredded should be in the CYFD file. *Id.*

Based on this communication with Ms. Crotts, Defendant asserts that Lieutenant Rudiger was "presumably aware of some of the childish ramblings that are obviously quotes, since they would have been written out in the handwritten notes that he reviewed." *Id.* Specifically, Defendant argues Lieutenant Rudiger "would have been aware that the 6-year-old child stated that the guns were used to shoot at fire ants because she is allergic to them," and that the eight-year-old explained he injured his face by scratching off Halloween makeup, which contradicts the statement in the affidavit that the boy did not know how his face was injured. *Id.* at 3-4. Defendant further contends the affidavit contains a report that the family declined the school's offer of transportation, while Ms. Crotts' notes contain no such information. *Id.* at 4. Defendant

asks for a "further evidentiary hearing where Ms. Crotts can testify under oath and explain some of these issues." *Id.*

In response to the supplemental brief, the United States notes that Lieutenant Rudiger testified he did not rely on the notes that included the children's statements regarding shooting at fire ants and removing Halloween makeup. (Doc. 52) at 1. The United States contends the supplemental brief is a "thinly veiled attempt for Defendant to supplement his motion with a challenge pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978)." *Id.* at 2. The United States further argues Defendant has not established that Lieutenant Rudiger acted intentionally or recklessly or that any omissions were material. *Id.* at 3-6.

In order to find that the good faith exception does not apply because a warrant was based on a false affidavit, courts must find the affiant provided the false information "deliberately or recklessly." *Leon*, 468 U.S. at 923 (stating suppression remains appropriate remedy if magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth"). The Tenth Circuit explains that this standard does not encompass "negligence or innocent mistakes" and, instead, the record must reveal evidence of an intent to mislead or recklessness. *United States v. Campbell*, 603 F.3d 1218, 1228 (10th Cir. 2010) ("Other than the existence of the omissions themselves, we conclude Defendant has not revealed or provided any evidence in the record of an intent to mislead or recklessness on the part of the officers. Consequently, Defendant has failed to meet his burden of proof."). In addition, before granting a motion to suppress because an affidavit contains false statements or material omissions, courts must find the false statements or omissions would have altered the magistrate judge's probable cause determination. *Id.*

Here, the record does not reveal any evidence of an intent to mislead or recklessness on the part of Lieutenant Rudiger or any of the officers. First, Lieutenant Rudiger testified that he was not aware of the notes that mentioned shooting at fire ants or removing Halloween makeup, and pointed out that the notes that included those statements were dated three months after he prepared the affidavit and were not sent to him. *See* Tr. at 90-91, 174 (testimony of Lieutenant Rudiger stating he was not copied on email from Ms. Crotts dated February 9, 2017, and he had not seen it prior to the hearing).

Nevertheless, even accepting Defendant's assertion that Lieutenant Rudiger was aware of the entirety of Ms. Crotts' notes and did not include all of them in the affidavit, that does not equate to a finding that the affidavit was inaccurate or misleading or that the omitted information would have altered the magistrate judge's probable cause determination. While Defendant argues the statement by the six-year-old about shooting fire ants "would give any adult pause regarding the credibility of the child's statements," the statement nevertheless indicates the children were possibly exposed to the reckless use of guns. (Doc. 51) at 3. Similarly, regarding the eight-year-old's explanation that his face was injured because he was scraping off Halloween makeup, the affidavit still contained references to other injuries to the children, such as to the four-year-old's leg and back, the six-year-old's head, and the eight-year-old's leg.

In addition, to the extent Defendant is attempting to initiate an untimely *Franks* hearing to challenge the veracity of the search warrant, Defendant fails to make the required "substantial preliminary showing  that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks*, 438 U.S. at 155-56. As explained by the Tenth Circuit, "the failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming

corroborative evidence rarely suggests a knowing or reckless disregard for the truth. To the contrary, it is generally considered to betoken negligence at most." *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994) (citations omitted); *see also Romero v. Fay*, 45 F.3d 1472, 1477-78 (10th Cir. 1995) (explaining once probable cause exists, police are not required to go in search of exculpatory evidence). The record in this case does not demonstrate that Lieutenant Rudiger omitted portions of Ms. Crotts' notes knowingly, intentionally, or with reckless disregard for the truth, and any failure to further investigate amounts to "negligence at most." For these reasons, the Court does not find that the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit.

Based on the foregoing, none of the *Leon* exceptions to the good faith rule apply—the magistrate judge did not rely on a deliberately or recklessly false affidavit or abandon his judicial role, and the warrant was not devoid of factual support for a finding of probable cause and was not facially deficient. 468 U.S. at 923. Additionally, it is important to note that Lieutenant Rudiger presented the warrant to the deputy district attorney who reviewed and approved it. The Tenth Circuit in *Otero* explained that "one of the more important facts" in considering the good faith exception "is the officers' attempts to satisfy all legal requirements by consulting a lawyer" because this shows the officers were not just conducting a "fishing expedition." 563 F.3d at 1135 ("The fact that Inspector Herman . . . made this step is an important indicator of her good faith."). For these reasons, the Court finds the good faith exception to the exclusionary rule applies.

### 3. Conclusion

For the reasons stated above, the search warrant lacked the requisite particularity to comply with the Fourth Amendment because it did not refer to a particular crime. Nonetheless,

the officers' reliance on the warrant was objectively reasonable, so the good faith exception to the exclusionary rule applies. Therefore, the United States has shown by a preponderance of the evidence that the search warrant did not violate the Fourth Amendment.

### B. Search of Truck

#### 1. Fourth Amendment Violation

Defendant next argues the search of his truck violates the Fourth Amendment because he did not voluntarily consent to the search. A search of a vehicle is constitutionally permissible if the owner of the vehicle "freely and voluntarily" consents to the search. *Florida v. Royer*, 460 U.S. 491, 497 (1983) (explaining United States bears burden of showing that consent was voluntary). The Tenth Circuit has held that consent must be (1) clear and unequivocal, and (2) "given without duress or coercion, express or implied." *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007) (citation omitted).

The first prong can be satisfied by verbal or non-verbal conduct. *Id.* at 790. As to the second prong, the court must determine "whether a reasonable person would believe he was free to leave or to deny the officer's request to search." *Id.* Factors to consider in making this determination include: the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether the officers' weapons are displayed; the number, demeanor, and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as identification; and whether or not the officers have specifically advised the defendant that he had the right to terminate the encounter or refuse consent. *United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017) (citation omitted).

"Although no single factor is dispositive, the strong presence of two or three factors may be sufficient to support the conclusion a seizure occurred." *Id.* (citation omitted). Moreover, "the question whether a consent to search was in fact voluntary or was the product of duress and coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *United States v. Latorre*, 893 F.3d 744, 756 (10th Cir. 2018) (citations omitted).

In the Motion to Suppress, Defendant argues the following facts demonstrate his consent was not voluntary: he was ordered out of the truck; he was handcuffed; his identification was taken; he was separated from Ms. Maynes; his kids were being held; he was ordered to sit on the sidewalk; and there were at least five officers present; and some of the officers were in uniform and armed. (Doc. 26) at 10-11. Defendant further argues the nature of the questioning was "accusatory and intimidating" because Lieutenant Rudiger told him he had a search warrant for the house to search for guns, and stated: "You can hand them over to me, and you might get them back, or I can take them my way and you'll never get them back." *Id.* at 3.

Considering the factors set forth in *Hernandez*, the record shows: the search was in public and in view of persons other than law enforcement officers; four law enforcement officers were present and armed, and one was in uniform; and Defendant and Ms. Means were separated and asked not to stand next to each other. Tr. at 25, 36, 81, 83, 130. In addition, no evidence has been presented that the officers specifically advised Defendant he had the right to terminate the encounter or refuse consent.

With regard to whether Defendant's identification was held during the search, Defendant presented no evidence to support such a finding. Instead, both Lieutenant Rudiger and Detective Fetrow testified they did not take Defendant's identification and did not see anyone else do so.

Tr. at 86-87, 129.  The Court finds this testimony credible and unrefuted by any objective evidence, so the Court determines that Defendant's identification was not held by the officers.

Next, the Court considers Defendant's contention that Lieutenant Rudiger was accusatory and intimidating and told Defendant the only way he would get his guns back is if he handed them over.  (Doc. 26) at 3, 10.  No evidence was presented to support this claim.  Instead, Lieutenant Rudiger testified that he asked Defendant if there were any weapons present for officer safety purposes, and that he asked this in a "normal" way that was not "commanding" because Defendant was being cooperative.  Tr. at 31, 106-07.  Lieutenant Rudiger further testified that it was during the interview the next day at Lieutenant Rudiger's office that he and Defendant had a conversation about whether Defendant could get his firearms back.  Tr. at 82-84.  The Court finds this testimony is also credible and unrefuted by objective evidence, so the Court finds Lieutenant Rudiger's demeanor in asking if there were weapons present was not accusatory or intimidating.

In the Motion to Suppress, Defendant asserts that he was handcuffed during this encounter.  (Doc. 26) at 3, 10.  At the hearing, Lieutenant Rudiger and Detective Fetrow testified that they did not place Defendant in handcuffs, they did not see anyone else place him in handcuffs, and they did not see him in handcuffs at any time before, during, or after the searches of the truck and house.  Tr. at 26, 34, 42, 87, 122-23, 126.  In contrast, Mr. Samaniego testified that he was Defendant's neighbor, he saw two detectives at Defendant's residence "snooping around" and then saw five or six police cars come all at once, and at some point thereafter he saw Defendant in handcuffs.  Tr. at 147-48, 157.  Mr. Samaniego stated he was about fifteen or twenty feet away from Defendant and did not see anyone place Defendant in handcuffs, but he said he saw Defendant sitting down on a log and walking around while handcuffed, and that

Defendant was handcuffed until the law enforcement officers were leaving. *Id.* at 149, 152, 164.

When asked when this incident happened, Mr. Samaniego first said about a year and a half ago,

in November 2018, in the morning, but he later said he was not sure when it happened. *Id.* at

153-54, 156, 165-66. Mr. Samaniego further testified that when the first two detectives arrived,

Defendant's truck was already at the residence and Defendant was inside the house. *Id.* at 162-

63.

After reviewing this evidence and weighing the credibility of the witnesses, the Court

finds that Defendant was most likely not handcuffed at the time he told Lieutenant Rudiger there

were weapons in his truck. In making this finding, the Court notes that Lieutenant Rudiger and

Detective Fetrow's testimony was consistent that Defendant was not handcuffed, Lieutenant

Rudiger and Detective Fetrow were located closer to Defendant than Mr. Samaniego, and the

photographs of the scene show Defendant standing up and not handcuffed. Additionally, Mr.

Samaniego's testimony about the timing of the incident, the presence of Defendant's truck when

the first two detectives arrived, and that Defendant was already in the house, does not match with

the sequence of events presented by both Defendant and the United States. The Court also finds

it unlikely that the officers would allow Defendant to walk around in handcuffs, as Mr.

Samaniego testified.

Considering the above factors and the totality of the circumstances, the evidence supports

a finding that Defendant's consent was "given without duress or coercion, express or implied."

*Guerrero*, 472 F.3d at 789. On one hand, there were multiple armed officers present and they

did not specifically advise Defendant he could terminate the encounter. Nevertheless, the

encounter happened in public view, Defendant was not physically restrained, Defendant's

personal effects were not held, and Lieutenant Rudiger did not ask Defendant about weapons in a

coercive or intimidating manner.  Therefore, the Court finds that Defendant voluntarily consented to the search of his truck.

### 2. *Fifth Amendment Violation*

Defendant also challenges the search of the truck because he was not given a *Miranda* warning before informing the officers there were guns in the truck.  (Doc. 26) at 11-13.  A *Miranda* warning is required when a defendant is interrogated while in custody.  *United States v. Revels*, 510 F.3d 1269, 1273 (10th Cir. 2007).  "Whether a suspect is in custody represents an objective determination."  *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008).  The Supreme Court held in *Berkemer v. McCarty* that custodial interrogations are those in which the defendant's "freedom of action is curtailed to a degree associated with formal arrest."  468 U.S. 420, 440 (1984).  To distinguish between custodial interrogations and officers asking investigatory questions, courts look to: "(1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made [defendant] aware that [he] was free to refrain from answering questions, or to otherwise end the interview."  *Revels*, 510 F.3d at 1275.

First, the record does not establish that Defendant was in custody at the time he consented to the search of his truck.  The evidence shows that there were three plainclothes detectives and one uniformed officer and Lieutenant Rudiger only asked Defendant if he had weapons in order for the officers to secure them.  Tr. at 25, 31.  These circumstances do not demonstrate a police-dominated atmosphere or that the nature and length of the officers' questioning was accusatory or coercive, so the Court finds there was no custodial interrogation.

In addition, even if there was a custodial interrogation, an officer may question a suspect without first giving *Miranda* warnings if the questions arise out of "an objectively reasonable

need to protect the police or the public from any immediate danger associated with the weapon." *New York v. Quarles*, 467 U.S. 649, 659 n.8 (1984). The Tenth Circuit has applied the *Quarles* public safety exception to allow an officer to ask a suspect "Do you have any guns or sharp objects on you" without first giving the *Miranda* warnings. *United States v. Lackey*, 334 F.3d 1224, 1225 (10th Cir. 2003). "For an officer to have a reasonable belief that he is in danger, at minimum, he must have a reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it." *United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009) (citation omitted). Moreover, "the availability of [the public-safety exception] does not depend upon the motivation of the individual officers involved." *Quarles*, 467 U.S. at 656.

Here, Lieutenant Rudiger testified that he asked Defendant if there were weapons present for officer and public safety purposes. Tr. at 29-30. The United States contends this question was reasonable because the officers had information that Defendant had a violent criminal history, possessed firearms, was a drug user, and had just been informed his children were in CYFD custody. (Doc. 30) at 17. The Court agrees it was objectively reasonable for the officers to believe that Defendant might have a weapon based on his criminal history and the statements by his children. Therefore, based on the public safety exception, Lieutenant Rudiger was not required to give Defendant *Miranda* warnings before asking him if there were weapons present.

### 3. Conclusion

The Court finds that Defendant voluntarily consented to the search of the truck and the officers were not required to give him *Miranda* warnings before inquiring about the presence of weapons. Therefore, the Court finds that Defendant's Fourth and Fifth Amendment rights were not violated with regard to the search of the truck.

*C. Fruit of the Poisonous Tree, Inevitable Discovery, and Attenuation Doctrines*

Defendant asks the Court to suppress the firearms and ammunition obtained from the residence and the truck under the "fruit of the poisonous tree" doctrine. (Doc. 26) at 13. Evidence is a "fruit of the poisonous tree" if it was discovered as a direct result of a law enforcement officer's unlawful activity and there is a "factual nexus between the illegality and the challenged evidence." *United States v. Olivares-Rangel*, 458 F.3d 1104, 1108-09 (10th Cir. 2006) (quoting *Wong Sun v. United States*, 371 U.S. 471, 485 (1963)). However, "the Government may still avoid suppression by proving that the contested evidence is not fruit of the poisonous tree." *Id.* at 1109. The issue then becomes whether officers obtained the derivative evidence "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* "Even if [the defendant] can demonstrate that the evidence resulted from the [illegality], the government may avoid suppression by demonstrating that the evidence would have been inevitably discovered, that it was discovered by independent means, or that it was so attenuated from the illegality as to dissipate any taint from the Fourth Amendment violation." *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006).

The Court has not found any violation of Defendant's Fourth or Fifth Amendment rights in the search of the residence or the truck, so the fruit of the poisonous tree doctrine is inapplicable. Nevertheless, if either of these searches were the result of a constitutional violation, the evidence should not be suppressed for three reasons.

First, any violation of Defendant's *Miranda* rights cannot be used to suppress the evidence obtained from the truck. The Tenth Circuit has held that "physical evidence obtained as a fruit of a voluntary statement by a defendant to a law-enforcement officer is admissible at trial regardless of whether the officers gave the defendant *Miranda* warnings." *United States v.*

*Phillips*, 468 F.3d 1264, 1265 (10th Cir. 2006); *see also United States v. Patane*, 542 U.S. 630, 635 (2004) (holding that gun should not be suppressed where defendant disclosed its location and gave officers permission to retrieve it in response to custodial questioning without *Miranda* warning). Because the Court finds that Defendant's statement regarding the guns in the truck was voluntary (*see* Section III.B.1. above), any violation of his *Miranda* rights cannot be used to suppress the evidence obtained as a result of that statement.

Second, the United States contends that the officers would have discovered the evidence pursuant to the inevitable discovery doctrine as a result of the interview with Defendant the day after the search. (Doc. 30) at 19-20. "The inevitable discovery doctrine provides an exception to the exclusionary rule and permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it." *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005) (citation omitted). The United States bears the burden of proving the evidence would have inevitably been discovered without a Fourth Amendment violation. *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014). Here, the record shows that Lieutenant Rudiger interviewed Defendant the next day in relation to the CYFD child abuse investigation and would have done so regardless of the search of the residence and truck. (Doc. 30) at 19-20; Tr. at 40-43. At this interview, Lieutenant Rudiger read Defendant his *Miranda* warnings and Defendant then told Lieutenant Rudiger that he owned guns and used and sold drugs. Tr. at 40. The Court, therefore, finds the evidence should not be suppressed because law enforcement would have inevitably discovered it.

Third, the United States asserts that Defendant's statements the day after the search were sufficiently attenuated from any constitutional defects in the search of the residence or truck. (Doc. 30) at 20-21. Pursuant to the attenuation doctrine, "[e]vidence is admissible when the

connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *United States v. Ramos*, 723 Fed. Appx. 632, 640 (10th Cir. 2018) (citation omitted). The Supreme Court has set out three factors relevant to this inquiry: (1) the temporal proximity between the police illegality and the consent to search; (2) the presence of intervening circumstances; and particularly (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975); *United States v. Caro*, 248 F.3d 1240, 1247 (10th Cir. 2001).

As to the first factor, the Tenth Circuit has found that a time-period of less than 30-45 minutes does not weigh in favor of finding attenuation. *See United States v. Fox*, 600 F.3d 1253, 1260 (10th Cir. 2010). For the second factor, the government must identify intervening events that "isolate[ ] the defendant from the coercive effects of the original" illegality, and must view this factor from the "defendant's perspective." *United States v. Gregory*, 79 F.3d 973, 980 (10th Cir. 1996). The third factor favors exclusion "only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Ramos*, 723 Fed. Appx. at 641 (citation omitted). "[P]urposeful and flagrant misconduct is generally found where: 1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless and 2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up." *Fox*, 600 F.3d at 1261.

Here, Defendant voluntarily went to the police station the day after the search and admitted to drug use and possession of firearms and ammunition after he was Mirandized.

Additionally, there is no evidence in the record that the law enforcement officers engaged in purposeful or flagrant misconduct. The Court finds the delay of one day, the intervening *Miranda* warning, and lack of evidence of flagrant misconduct by the officers, all weigh in favor of applying the attenuation doctrine. Therefore, the Court finds any constitutional violation regarding the search of the house or the truck was sufficiently attenuated from Defendant's Mirandized statements made the following day.

IV.     Conclusion

For the foregoing reasons, the Court finds that the search warrant violated Defendant's Fourth Amendment rights because it did not specify which crime was being investigated. However, the good faith exception to the exclusionary rule applies because the officers' reliance on the warrant was objectively reasonable. Therefore, the Court finds no Fourth Amendment violation with regard to the search warrant.

In addition, Defendant voluntarily consented to the search of the truck and the officers were not required to give him *Miranda* warnings before inquiring about the presence of weapons. The Court, therefore, finds that Defendant's Fourth and Fifth Amendment rights were not violated with regard to the search of the truck.

Finally, even if the search of the house or the truck were in violation of Defendant's constitutional rights, the inevitable discovery and attenuation doctrines apply based on Defendant's post-*Miranda* interview the day after the searches.

IT IS ORDERED that Defendant's Motion to Suppress (Doc. 26) is denied.

_____
UNITED STATES DISTRICT JUDGE